# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BEAR STEARNS COMPANIES, INC. SECURITIES, DERIVATIVE, AND ERISA LITIGATION<br><br>This Document Relates To:<br>    Securities Action, 08 Civ. 2793 (RWS) | Master File No:<br>08 M.D.L. No. 1963 (RWS)<br><br>ECF CASE |
| SRM GLOBAL MASTER FUND LIMITED PARTNERSHIP<br><br>       Plaintiff,<br><br><br>  v.<br><br>THE BEAR STEARNS COMPANIES LLC (F/K/A BEAR STEARNS COMPANIES INC.), ALAN D. SCWARTZ, SAMUEL L. MOLINARO, JR., JAMES CAYNE, WARREN SPECTOR and DELOITTE & TOUCHE LLP,<br><br>      Defendants. | No. 13 Civ. 2692 (RWS) |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................iii

PRELIMINARY STATEMENT .........................................................................................1

FACTUAL SUMMARY ....................................................................................................3

I.    Plaintiff SRM.........................................................................................................3

II.   Bear's Collapse......................................................................................................5

III.  SRM's Complaint ..................................................................................................5

      A.    Misrepresentations and Omissions Relating to Bear's Models and Valuations......5

      B.    Deloitte's False and Misleading "Clean Opinions"...................................7

      C.    SRM's Reliance on Defendants' Misrepresentations
            and Omissions ..............................................................................................8

ARGUMENT ....................................................................................................................9

IV.   PLEADING STANDARDS ...................................................................................9

V.    SRM'S COMPLAINT STATES A CLAIM UNDER SECTION 10(b) ...........................10

      A.    SRM's Section 10(b) Claims Are Not Time Barred ..........................10

            1.    SRM's Complaint was timely filed under *American Pipe* .......................10

            2.    *IndyMac*'s holding with respect to §13 of the Securities
                  Act does not apply to 28 U.S.C. §1658(b)(2), applicable to the
                  Exchange Act..........................................................................................12

            3.    SRM's claims based on its Bear swaps are subject to
                  *American Pipe* tolling.......................................................................17

                  a.    *American Pipe* tolls subsequent claims challenging the
                        same underlying conduct as the Class Action ................................18

i

b. Defendants' argument that swap transactions are "fundamentally different" for purposes of *American Pipe* tolling is mistaken and inconsistent with the position Defendants took in the Class Action ................................................................................. 20

B. SRM States a Section 10(b) Claim Based on Its Bear Swap Transactions ........... 21

1. The CFMA expanded Section 10(b) and Rule 10b-5 to reach "any securities-based swap agreement" (even while excluding such swaps from the definition of "security") ............................................................. 21

2. Section 10(b) and Rule 10b-5 reach fraud "in connection with" the purchase or sale of a covered instrument ............................................. 22

3. Dodd-Frank independently authorizes SRM's Section 10(b) claim .......... 23

VI. SRM'S COMPLAINT STATES A CLAIM UNDER SECTION 18 ............................... 24

VII. SRM'S COMPLAINT STATES A COMMON LAW FRAUD CLAIM UNDER NEW YORK LAW ............................................................................... 26

A. SRM Pleads Actual, Justifiable Reliance ............................................... 26

B. SRM's Fraud Claims Are Not Time Barred .......................................... 30

C. SRM's Holder Claims are Actionable Under New York Law ............................. 33

D. Deloitte is Liable for Common Law Fraud Based on SRM's Swap Transactions ................................................................................ 35

VIII. SRM'S COMPLAINT STATES A CLAIM UNDER SECTION 20(a) ........................... 35

CONCLUSION ................................................................................. 35

# TABLE OF AUTHORITIES

## STATE AND FEDERAL CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
    677 F.3d 60 (2d Cir. 2012) ..........................................................................17

*Adair v. Bristol Technology Systems, Inc.,*
    179 F.R.D. 126 (S.D.N.Y. 1998) ..................................................................4

*Allied Irish Banks, P.L.C. v. Bank of America, N.A.,*
    No. 03 CIV. 3748, 2006 WL 278138 (S.D.N.Y. 2006) .................................30

*American Pipe & Const. Co. v. Utah,*
    414 U.S. 538 (1974) ..............................................................................*passim*

*Anwar v. Fairfield Greenwich Ltd.,*
    728 F. Supp. 2d 372 (S.D.N.Y. 2010) ....................................................27, 28

*Arco Capital Corp. Ltd. v. Deutsche Bank AG,*
    No. 12 CIV. 7270, 2013 WL 2467986 (S.D.N.Y. 2013) ...............................10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) .........................................................................28

*Ballard v. Tyco Intern., Ltd.,*
    2005 WL 1683598 (D. NH. 2005) ..............................................................14

*Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,*
    850 F. Supp. 1199 (S.D.N.Y. 1994) ...........................................................28

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .....................................................................................9

*Benfield v. Mocatta Metals Corp.,*
    26 F.3d 19 (2d Cir. 1994) ...............................................................18,19, 20

*Brown v. Thompson,*
    374 F.3d 253 (4th Cir. 2004) ......................................................................24

*Caiola v. Citibank, N.A., New York,*
    295 F.3d 312 (2d Cir. 2002) ...............................................................3, 21, 22

*Chemical Bank v. Arthur Anderson & Co.,*
    726 F.2d 930 (2d Cir. 1984) .......................................................................23

*Cookeville Regional Medical Center v. Leavitt*,
    531 F.3d 844 (D.C. Cir. 2008) ....................................................................24

*Continental Ins. Co. v. Mercadante*,
    222 A.D. 181 (N.Y. App. Div. 1 Dept. 1927) ...........................................33, 34

*Crown, Cork & Seal Co., Inc. v. Parker*,
    462 U.S. 345 (1983) ..................................................................1, 11, 17, 18

*Cullen v. Margiotta*,
    811 F.2d 698 (2d Cir. 1987) ........................................1, 2, 18, 19, 20, 25, 31

*Devaney v. Chester*,
    709 F. Supp. 1244 (S.D.N.Y. 1989) ............................................................28

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005) ....................................................................................28

*Eastside Holdings Inc. v. The Bear Stearns Companies Inc.*,
    08-cv-2739, (S.D.N.Y) ............................................................................1, 10

*Elliott Associates v. Porsche Automobile Holding SE*,
    759 F. Supp. 2d 469 (S.D.N.Y. 2010) .......................................17, 20, 22, 35

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003) ........................................................................28

*Footbridge Ltd. Trust v. Countrywide Financial Corp.*,
    770 F. Supp. 2d 618 (S.D.N.Y. 2011) .................................................12, 13

*Forest Grove Sch. Dist. v. T.A.*,
    557 U.S. 230 (2009) ....................................................................................13

*Frymire-Brinati v. KPMG Peat Marwick*,
    2 F.3d 183 (7th Cir. 1993) ..........................................................................23

*Granite Partners, L.P. v. Bear Stearns & Co. Inc.*,
    58 F. Supp. 2d 228 (S.D.N.Y. 1999) ..........................................................28

*Grubka v. WebAccess Intern., Inc.*,
    445 F. Supp. 2d 1259 (D. Col. 2006) ..........................................................14

*Healthcare Fin. Grp., Inc. v. Bank Leumi USA*,
    669 F. Supp. 2d 344 (S.D.N.Y. 2009) ........................................................28

*Hildes v. Andersen*,
    No. 08-cv-0008, 2010 WL 4811975 (S.D. Cal. 2010) ..................................14

*In re Alstom SA Sec. Litig.,*
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ............................................................................. 26

*In re Ames Dept. Stores Inc. Stock Litig.,*
    991 F.2d 953 (2d Cir. 1993) .................................................................................... 22, 23

*In re Bear Stearns Cos., Inc. Securities, Derivative, and ERISA Litig.,*
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) .......................................... 5, 6, 9, 10, 29, 32

*In re Discovery Zone Sec. Litig.,*
    181 F.R.D. 582 (N.D. Ill. 1998) ................................................................................. 14

*In re Enron Corp. Sec.,*
    465 F. Supp. 2d 687 (S.D. TX. 2006) ........................................................................ 14

*In re IndyMac Mortgage-Backed Sec. Litig.,*
    793 F. Supp. 2d 637, 642-43 (S.D.N.Y. 2011) .......................................................... 13

*In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,*
    815 F. Supp. 620 (S.D.N.Y. 1993) ............................................................................. 33

*In re Lehman Bros. Sec. and ERISA Litig.,*
    799 F. Supp. 2d 258 (S.D.N.Y. 2011) ........................................................................ 33

*In re Leslie Fay Cos., Inc.,*
    871 F. Supp. 686 (S.D.N.Y. 1995) ............................................................................. 23

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.,*
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ........................................................................ 28

*In re Merck Co. Sec. Litig.,*
    Fed. Sec. L. Rep. P 97 (D. NJ. Order of Dec. 12, 2012) ............................................ 14

*In re Morgan Stanley Mortgage Pass-Through Certificates Litig.,*
    810 F. Supp. 650 (S.D.N.Y. 2011) ............................................................................. 14

*In re Northwest Airlines Corp.,*
    483 F.3d 160 (2d Cir. 2007) ....................................................................................... 13

*In re Smith Barney Transfer Agent Litig.,*
    884 F. Supp. 2d 152 (S.D.N.Y. 2012) ........................................................................ 14

*In re Tower Auto. Sec. Litig.,*
    483 F. Supp. 2d 327 (S.D.N.Y. 2007) ........................................................................ 27

*In re Worldspace Sec. Litig.*,
No. 07 CIV. 2252, 2008 WL 2856519 (S.D.N.Y. 2008)....................................9

*Indiana Bell Tel. Co. v. Ward*,
No. IP 02-170-C H/K, 2002 WL 32067296 (S.D. Ind. 2002) .........................27

*Int'l Broad. Corp. v. Turner*,
734 F. Supp. 383 (D. Minn. 1990) ...............................................................26

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
822 F. Supp. 2d 368 (S.D.N.Y. 2011) ..........................................................28

*Intesa Sanpaolo, S.p.A. v. Credit Agricole Corporate & Inv. Bank*,
No. 12 CIV. 2683, 2013 WL 525000 (S.D.N.Y. 2013).................................10

*Irvin v. Jones*,
No. 3942-12, 2012 WL 6634476 (N.Y. Sup. Ct. Dec. 13, 2012)....................35

*Johnson v. Railway Express Agency Inc.*,
421 U.S. 454 (1975) .....................................................................................18

*Joseph v. Wiles*,
223 F.3d 1155 (10th Cir. 2000) ....................................................................14

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
108 F.3d 1531 (2d Cir. 1997) .......................................................................30

*Lentell v. Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005) .........................................................................28

*Leshinsky v. Telvent* GIT *, S.A.*,
873 F. Supp. 2d 582 (S.D.N.Y. 2012) ..........................................................24

*Levy v. Sterling Holding Co. LLC*,
544 F.3d 493 (3d Cir. 2008) .........................................................................24

*Lorillard v. Pons*,
434 U.S. 575 (1978) ................................................................................13, 14

*Matana v. Merkin*,
No. 13 CIV. 1534, 2013 WL 3940825 (S.D.N.Y. 2013).................................34

*Merck & Co., Inc. v. Reynolds*,
559 U.S.633 (2010) ................................................................................13, 14

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
  547 U.S. 71 (2006) ...................................................................22

*Miles v. Apex Marine Corp.,*
  498 U.S. 19 (1990) ...................................................................13

*Morrison v. Nat'l Australia Bank Ltd.,*
  130 S. Ct. 2869 (2010) ............................................................17

*New Oriental Educ. & Tech. Grp. Sec. Litig.,*
  2013 WL 1875102 (S.D.N.Y. 2013) .......................................18

*Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman,*
  277 B.R. 20 (S.D.N.Y. 2002) ......................................1, 2, 11, 15, 15, 16, 17

*Plumbers, Pipefitters & MES v. Fairfax Holdings,*
  886 F. Supp. 2d 328 (S.D.N.Y 2012) .....................................15

*Police & Fire Retirement System of City of Detroit v. IndyMac MBS, Inc.,*
  721 F.3d 95 (2d Cir. 2013) ..............................................*passim*

*Prieto v. John Hancock Mut. Life Ins. Co.,*
  132 F. Supp. 2d 506 (N.D. TX 2001) .....................................14

*Primavera Familienstifung v. Askin,*
  130 F. Supp. 2d 450 (S.D.N.Y. 2001) ..............................30, 34

*Prime Mover Capital Partners, L.P. v. Elixir Gaming Technologies, Inc.,*
  793 F. Supp. 2d 651 (S.D.N.Y. 2011) ..............................33, 34

*Salkind v. Wang,*
  1995 WL 170122 (D. Mass. 1995) .........................................14

*Sargiss v. Magarelli,*
  12 N.Y.3d 527 (N.Y. 2009) .....................................................31

*SEC v. Rorech,*
  720 F. Supp. 2d 367 (S.D.N.Y. 2010) ....................................22

*SEC v. Texas Gulf Sulphur Co.,*
  401 F.2d 833 (2d Cir. 1968) (*en banc*) ..................................23

*Short v. Belleville Shoe Mfg. Co.,*
  908 F.2d 1385 (7th Cir. 1990) ................................................13

*Staehr v. Hartford Financial Services Group, Inc.*,
    547 F. 3d 406 (2d Cir. 2008) ............................................................. 4

*Starr Foundation v. AIG, Inc.*,
    76 A.D.3d 25 (NY App. Div. 1st Dept. 2010) ................................... 34

*TBK Partners, Ltd. v. Western Union Corp.*,
    675 F.2d 456 (2d Cir. 1982) ......................................................... 21, 25

*Tradex Global Master Fund SPC LTD v. Titan Capital Group III, LP*,
    95 A.D.3d 586 (1st Dep't 2012) ....................................................... 35

*Turtur v. Rothschild Registry, Int'l, Inc.*,
    No. 91 v. CIV. 6222, 1993 WL 338205 (S.D.N.Y. 1993) ................. 28

*United States v. Kubrick*,
    444 U.S. 111 (1979) ......................................................................... 16

*United States v. O'Hagan*,
    521 U.S. 642 (1997) ....................................................................... 3, 22

*Valentini v. Citigroup, Inc.*,
    837 F. Supp. 2d 304 (S.D.N.Y. 2011) ...................................... 17, 20, 35

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982) ............................................................... 34

## **STATUTES AND RULES**

15 U.S.C. § 15b ...................................................................................... 12

15 U.S.C. § 78(c) ................................................................................. 1, 2

15 U.S.C. § 78(c)(10) ............................................................................. 24

15 U.S.C. § 78c(a) .................................................................................. 20

15 U.S.C. § 78r(c) ............................................................................... 1, 2

28 U.S.C. § 1658(b) .......................................................................... *passim*

Commodities Futures Modernization Act of 2000 ............................ *passim*

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 .............................. 23, 24

Fed. R. Civ. P. 8 ....................................................................................................26, 27

Fed. R. Civ. P. 9(b)..............................................................................3, 9, 10, 26, 27

Gramm-Leach-Bliley Act of 1999......................................................................21

N.Y. CVP LAW §213(8).....................................................................................31

N.Y.C.P.L.R. § 213 (McKinney 2013).................................................................1

Sarbanes-Oxley Act of 2002.......................................................7, 12, 14, 15, 24

Securities Act of 1933 § 13 .........................................................2, 12, 13, 14, 24

Securities Exchange Act of 1934 § 10b, 15 U.S.C. § 78j(b).................................*passim*

Securities Exchange Act of 1934 §18, 15 U.S.C. § 78r .......................1, 2, 3, 24, 25, 26

Securities Exchange Act of 1934 20(a) ................................................................35

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ..................................................3, 14, 21, 22

## SECONDARY SOURCES

147 Cong. Rec. S11946-01 (daily ed. Jan 2, 2001)....................................................22

Committee on the Judiciary Report, Additional Views (May 6, 2002), 2002 WL 32054437 ......15

Corman, *Limitations of Actions,* §1.3.2.1 at 30-31 (1991) ..........................................16

July 10, 2002 Floor Debate, 2002 WL 32054481 ........................................................15

Thomas Lee Hazen, 4 *Law of Securities Regulation* §§2:13[1][B][4];
        12:18[4] (6th ed. 2009)...............................................................................26

Wright & Miller, *Federal Practice and Procedure:* Civil 2d §1298 (1990)...............................27

Plaintiff SRM Global Master Fund Limited Partnership ("SRM" or "Plaintiff")

respectfully submits this Memorandum of Law in Opposition to the Motions to Dismiss the

Complaint filed on April 24, 2013 by Defendants Bear Stearns Companies LLC (F/K/A Bear

Stearns Companies Inc.) ("Bear" or "Bear Stearns"), Alan D. Schwartz ("Schwartz"), Samuel L.

Molinaro, Jr. ("Molinaro"), James Cayne ("Cayne"), Warren Spector ("Spector") (collectively,

the "Bear Defendants") and Deloitte and Touche, LLP ("Deloitte") (together with the Bear

Defendants, the "Defendants").

## PRELIMINARY STATEMENT

Until opting out, SRM had been a party to a class action lawsuit against Defendants,

*Eastside Holdings Inc. v. The Bear Stearns Companies Inc.,* 08-cv-2739 (S.D.N.Y.) **(**the "Class

Action"), since that case was filed on March 17, 2008, years before the expiration of any

applicable statutory periods.[1]  *See American Pipe & Const. Co. v. Utah,* 414 U.S. 538, 551

(1974), ("the claimed members of the class stood as parties to the suit until and unless they

received notice thereof and chose not to continue."); *Official Committee of Asbestos Claimants of

G-I Holding, Inc. v. Heyman,* 277 B.R. 20, 32 (S.D.N.Y. 2002) (putative class members have

effectively been a party to the action against defendants since a class action covering plaintiff

was requested but never denied).  SRM was "expected and encouraged to remain passive during

the early stages of the class action and 'to rely on the named plaintiffs to press their claims.'"

*Cullen v. Margiotta*, 811 F.2d. 698, 719 (2d Cir. 1987) (quoting *Crown, Cork & Seal Co., Inc. v.

Parker,* 462 U.S. 345, 350-51 (1983)).  "Not until a class is certified 'does a class member have

any duty to take note of the suit or to exercise any responsibility with respect to it….'"  *Id.*

After the Settlement Class was certified, SRM timely opted out effective November 29,

---

[1] 28 U.S.C. §1658(b) (Section 10(b); 15 U.S.C. §78r(c) (Section 18); and N.Y.C.P.L.R. § 213 (McKinney 2013) (common law fraud).

2012 and filed the current lawsuit less than five months later on April 24, 2013, four years and 214 days before expiration of the five year statutory period under Section 1658(b)(2) and more than two years before expiration of the three year statutory period under 15 U.S.C. §78r(c) under the tolling rule of *American Pipe*. The commencement of the Class Action satisfied the requirements of the statutory periods for SRM under Sections 10(b) and 18 of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for common law fraud under New York law, which has a six year statute of limitations in any event. *See American Pipe,* 414 U.S. at 551 ("Thus, the commencement of the action satisfied the purpose of the limitation provision as to all those who might subsequently participate in the suit as well as for the named plaintiffs."); *Asbestos,* 277 B.R. at 32 (same with respect to statute of repose). Section V.A.1, *infra*.

Defendants' reliance on *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.,* 721 F.3d 95 (2d Cir. 2013) ("*IndyMac*") in opposition to *American Pipe* tolling with respect to Section 1658(b)(2) is misplaced. Defendants' inaccurate quotation from *IndyMac*, (The Bear Stearns Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint ("MTD") at 1), is telling: Defendants omit the critical language limiting that decision to "the statute of repose in Section 13" of the Securities Act of 1933 (the "Securities Act"). 721 F.3d at 109. Section 13 is a different statute, with critically different language and history than Section 1658(b)(2), the statutory period applicable here. These differences demand a different result.

SRM's claims based on its purchases of Bear equity swaps, as well as SRM's claims under Section 18 of the Exchange Act and for common law fraud, were tolled by the filing of the Class Action since they are all based on the same conduct by Defendants challenged in the Class Action, which is the standard in this Circuit. *See Cullen*, 811 F.2d at 721 (state law claims tolled RICO claim because of common challenged conduct); Sections V.A.3; VI and VII.B, *infra*.

Defendants also argue that SRM's Complaint should be dismissed for several other reasons, none of which are sound:

First, as "security-based" swaps, SRM's Bear equity swaps have been subject to Section 10(b) and Rule 10b-5 since 2000, when the Commodities Futures Modernization Act ("CFMA") was enacted. *See Caiola v. Citibank, N.A., New York,* 295 F.3d 312, 327 (2d Cir. 2002) (acknowledging that after CFMA Rule 10b-5 "clearly" covered security-based swap transactions). It is also black-letter law that Section 10(b) and Rule 10b-5 reach fraudulent conduct "in connection with" the purchase or sale of a covered instrument, with no requirement that a defendant be the seller. *See*, *e.g.*, *United States v. O'Hagan,* 521 U.S. 642, 658 (1997) (requirement is deception "in connection with the purchase or sale" of any security, not deception of an identifiable purchase or seller). Section V.B, *infra*.

Second, Defendants are incorrect that reliance in SRM's common law fraud and Section 18 claims are subject to Rule 9(b)'s heightened pleading standard, which states that "conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Regardless, SRM's pleading of specific misrepresentations and omissions identified in SRM's Complaint and which SRM further alleges that it read and relied on, Section III.C, *infra*, are sufficient. Section VII.A, *infra*.

Third, contrary to Defendants, holder fraud claims are actionable under New York law. Section VII.C, *infra*.

## I.  Plaintiff SRM.

As Defendants note, MTD at 20-21, SRM is a sophisticated and contrarian investor.[2]  As

such, SRM is not content simply to follow market fashion or conventional wisdom.  Rather,

SRM makes its investment decisions based on its careful analysis of all available information,

particularly SEC filings and related financial disclosures by the companies in which it invests.

This makes SRM more reliant on honest, accurate financial reporting, the lack of which deceived

SRM into basing its investment decisions regarding Bear on materially false and misleading

information provided by Defendants.  For example, while the ordinary investor may pay little

attention to the Value at Risk ("VaR") amounts Bear reported in its SEC filings, SRM considered

such figures significant as an important indicator of Bear's level of risk.  In reliance on

Defendants' false and misleading representations and omissions regarding Bear's VaR, ¶¶59, 66,

172 (Bear knew the SEC had stated that Bear's VaR models were seriously flawed and they were

never updated to reflect the housing and subprime mortgage downturn),[3] SRM believed that Bear

was subject to substantially less risk than was in fact the case when SRM purchased and retained

its Bear stock and swaps, ¶¶73, 177.  Less sophisticated investors may be less vulnerable to fraud

relating to sophisticated information.

As a result of Defendants' fraud, SRM was a significant investor in Bear Stearns.  SRM

owned shares of Bear stock at least as early as March 2007 and continued to invest in Bear until

Bear's collapse.  ¶12.  Starting in September 2007, in addition to its purchases of common stock,

---

[2]  Other claims Defendants make about SRM are based on Exhibits 3 and 8 to the Declaration of Jessica S. Carey, which Defendants rely on for the truth of their contents.  *See* MTD at 4, 5 n.3.  This is improper on a motion to dismiss and these exhibits should be disregarded.  *See Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (on a motion to dismiss, proper "to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information" but only "without regard to the truth of their contents"); *Adair v. Bristol Technology Systems, Inc.*, 179 F.R.D. 126, 135 (S.D.N.Y. 1998) (Sweet, J.) (same).

[3] Citations in the form "¶ __" refer to paragraphs in the Complaint.  Citations in the form "Ex. __" refer to exhibits to the Declaration of Philip C. Korologos, filed herewith.

SRM purchased security-based swap agreements representing approximately 3.5 million shares of Bear common stock (SRM's "Bear swaps"). ¶13. SRM's Bear swaps were known as "total return swaps," which are synthetic instruments designed to mimic all aspects (*i.e.*, the "total return") of a stock as though the stock had been purchased itself. The price of SRM's Bear swaps was thus inflated to precisely the same extent and by precisely the same misrepresentations and omissions as Bear stock itself and when Bear's stock price collapsed, so did the value of SRM's Bear swaps. SRM's Bear swaps were the functional equivalent of shares of Bear common stock.

Between April 1 and June 2, 2008, after Bear had collapsed, SRM sold its holdings of Bear stock and swaps, incurring losses of more than $200 million on its investment. ¶243.

## II. Bear's Collapse.

The facts regarding Bear's collapse are alleged in the Complaint at ¶¶24-242 and set forth in detail in this Court's denial of the motion to dismiss in *In re Bear Stearns Cos., Inc. Securities, Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 445-47 (S.D.N.Y. 2011).

## III. SRM's Complaint.

### A. Misrepresentations and Omissions Relating to Bear's Models and Valuations.

In September 2008, the SEC's Office of Inspector General issued a report (the "OIG Report") revealing what had happened at Bear. In 2005 and again in 2006, the SEC had warned Bear that its models for valuating mortgage backed securities ("MBS") were outdated – they were more than 10 years old. ¶49. Bear's outdated models failed to take into account falling housing prices. ¶49. The SEC also advised Bear that its VaR models did not account for key factors such as changes in housing prices or rising default rates. ¶¶49-50, 59, 72, 79, 377. Bear never changed its valuation and VaR models. ¶¶51, 380. It was not until toward the end of 2007

that the Bear Defendants even attempted to respond to the SEC's concerns.  ¶380.  According to

the OIG Report, "reviews of mortgage models that should have taken place before the subprime

crisis erupted in February of 2007 appear to have never occurred." ¶51.  Bear's management

continued to operate the company on the basis of models it knew were deeply flawed and thus

deliberately operated in the dark with respect to the enormous risks Bear faced.  ¶¶256, 287.

Defendants never reported in any of Bear's public filings either the fact of the SEC's

warnings or that Bear's MBS valuation models were critically defective.  ¶310.  To the contrary,

Defendants represented in SEC filings that Bear regularly evaluated and enhanced its VaR

models.  ¶¶60, 71, 193 (2006 and 2007 10-K filings); 91, 127, 172 (2007 10-Q filings).  That

was false.  Defendants claimed Bear's "review of pricing models" was to ensure "the integrity

and clarity of the daily profit and loss statements."  ¶67 (2006 10-K); 89 (first-quarter 2007 10-

Q).  That, too, was false.  *In re Bear Stearns,* 763 F. Supp. 2d at 489-90.

Defendants also reported false and misleading aggregate VaR amounts, a measure which

was important to the market.  In its 2006 10-K and 2007 10-Q filings, Bear represented an

aggregate VaR far lower than those of Bear's peers.  ¶¶59-76, 90, 172.  Defendants knew that

Bear's aggregate VaR amounts failed to reflect exposure to declining housing prices, among

other things.  ¶70.  As a result, Defendants knew (or were reckless in not knowing) that Bear's

"VaR was inaccurate and outdated and inflated their asset values while underestimating their

risk."  *In re Bear Stearns,* 763 F. Supp. 2d at 488.

Similarly, Defendants reported false earnings figures and asset values derived from its

outdated, defective valuation models.  ¶¶39-41, 63, 77-78, 113, 192-211, 276.  Indeed, Bear hid

from investors the precipitous decline in the values of Bear's assets by carrying those assets at

full value on the books, even while privately acknowledging in dealings with counterparties that

the assets had significantly declined in value. ¶¶205-210.

While concealing these misrepresentations and omissions, Defendants Cayne, Molinaro and Schwartz certified that Bear's public filings were accurate and that they had implemented controls and procedures to ensure the accuracy of Bear's filings. Those Sarbanes-Oxley Act certifications (exhibits to Bear's 10-K and 10-Q filings) were all false. Despite repeated warnings from the SEC, Bear never addressed the deficiencies that were crucial to its ability to accurately assess the value of its assets and its exposure to risk. ¶¶64, 126, 172, 275, 416-418, 438, 452-55.

### B. Deloitte's False and Misleading "Clean Opinions".

Deloitte issued "clean opinions" pursuant to each of its audits of Bear's financial statements for fiscal years ended November 30, 2006 and November 30, 2007. ¶344. For example, in connection with Bear's Form 10-K for fiscal year 2007, Deloitte stated:

> In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

¶345. Deloitte caused this same unqualified opinion to be incorporated in Bear's 2006 10-K and it reaffirmed that opinion in each of Bear's 2007 Form 10-Q filings. ¶346. Deloitte knew, or was reckless in not knowing, that these representations were false and misleading. ¶¶348, 473-83. Deloitte ignored obvious "red flags" that would have placed a reasonable auditor on notice that Bear's financial statements were improper, *id.,* including:

(1) The SEC's warnings to Bear that Bear's mortgage valuation models were inaccurate and outmoded, ¶¶348, 368-377;

(2) The SEC's warnings to Bear that Bear's VaR models failed to reflect key indicators in the housing market, ¶349, 378-381;

(3) Bear's misleading accounting treatment of its bailout of its hedge funds, ¶350, 382-387;

(4) Multiple risk alerts related to Bear's internal controls, its internal audits, and its

risk management, ¶351, 394-412.

Deloitte knowingly or recklessly disregarded these red flags among others.  ¶¶473-83.

## C.    SRM's Reliance on Defendants' Misrepresentations and Omissions.

SRM identifies a number of specific misrepresentations and omissions on which it alleges actual reliance in purchasing or retaining its Bear securities.[4]  First, SRM alleges that it read each of these misrepresentations, "consistent with [SRM's] practice of reading all of Bear's Form 10-K and 10-Q filings."  ¶¶73, 177, 212, 353.  Second, SRM alleges that "the accuracy of Bear's valuation" of its MBS and other mortgage-related holdings "was very important to SRM" and that Defendants' adherence to GAAP "was central to SRM's inquiry, analysis and understanding

---

[4] **¶59** ("Bear reported reassuringly low VaR numbers, including an aggregate risk of just $28.8 million"); **¶60** ("Bear regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss."); **¶61** ("Bear … marked all positions to market on a daily basis and that it independently verified its inventory pricing."); **¶67** ("'review of pricing models' was part of Bear's effort 'in ensuring the integrity and clarity of the daily profit and loss statements'"); **¶69** ("Bear's risk management procedures 'begin with Bear marking its financial instruments owned to fair value on a daily basis'"); **¶71** (Bear represented that it "regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss"); **¶171** ("Bear Stearns filed its Form 10-Q for the quarterly period ended August 31, 2007, which included the same misleading financial results it reported on September 20, 2007."); **¶172** ("… stating that it 'regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss' and that its aggregate VaR was still only $35 million, well below its competitors."); **¶174** ("… 'the Company engages in an ongoing internal review of its valuations'"); **¶176** ("In its 3Q 2007 10-Q, Bear materially overvalued its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments when it reported that the current market value of its mortgages, mortgage- and asset-backed securities as $55.936 billion and the current market value of its other derivative financial instruments as $14.688 billion."); **¶193** ("In this filing, Bear again misrepresented its use of Value at Risk models, stating that it 'regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss'"); **¶195** ("it stated that '[c]omprehensive risk management procedures have been established to identify, monitor and control each of [the] major risks'"); **¶197** ("Bear's 2007 10-K, Bear represented that: 'The Risk Management Department is independent of all trading areas and reports to the chief risk officer…[t]he department supplements the communications between trading managers and senior management by providing its independent perspective on the Company's market risk profile.'"); **¶202** ("Bear reported higher values for its assets in its SEC filings than it agreed those same assets were worth in agreements with counterparties"); **¶203** ("… Bear 'compare[d] its model-based valuations with counterparties in conjunction with collateral exchange agreements.'"); **¶210** ("Bear nevertheless concealed this drop in the value of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments from the investing public.  Rather than record the collateral assets at the lower value which Bear acknowledged in its settlements with counterparties, 'Bear Stearns tended to use [its own] traders' more generous marks for profit and loss' as reported in Bear's SEC filings."); **¶211** ("In its 2007 10-K, Bear materially overvalued its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments when it reported that the current market value of its mortgages, mortgage- and asset-backed securities as $46.141 billion and the current market value of its other derivative financial instruments as $19.725 billion."); **¶345** ("In connection with Bear Form 10-K for fiscal year 2007, Deloitte stated: … 'In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.'"); **¶346** ("Deloitte caused this same unqualified opinion to be incorporated in Bear's 2006 10-K and in each of Bear's 2007 Form 10-Q filings.").

of Bear's value. *Id.* at ¶¶34, 36. SRM also alleges that it relied on these misrepresentations and

omissions, in deciding to purchase and retain Bear securities.[5] SRM alleges that these

misrepresentations and omissions concerned matters peculiarly within Defendants' knowledge.

¶¶22, 49, 53, 529, 530, 539.

## ARGUMENT

## IV. PLEADING STANDARDS.

A complaint must allege "enough facts to state a claim to relief that is plausible on its

face." *In re Bear Stearns,* 763 F. Supp. 2d at 484-85 (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)). The standard is satisfied so long as the complaint includes factual

allegations "sufficient 'to raise a right to relief above the speculative level.'" *In re Worldspace*

*Sec. Litig.*, No. 07 Civ. 2252, 2008 WL 2856519, at *3 (S.D.N.Y. July 21, 2008) (quoting

*Twombly*, 550 U.S. at 555). "However, Rule 9(b) does not require the pleading of detailed

---

[5] ¶**54** ("If Defendants had not made the misrepresentations and omissions alleged in this Complaint, ***Plaintiff would have sold*** all or a substantial amount of its Bear investment."); ¶**73** ("SRM read these materially false and misleading representations in Bear's 2006 10-K and ***relied on these materially false and misleading representations in its analysis of Bear and in deciding whether it should purchase*** Bear securities."); ¶**177** ("SRM read these materially false and misleading representations in Bear's third quarter 2007 10-Q, consistent with its practice of reading all of Bear's Form 10-K and 10-Q filings, and ***relied on these materially false and misleading representations in its analysis of Bear and in deciding whether it should retain its Bear investment***. SRM in fact retained its Bear investment in reliance on Bear's misrepresentations and omissions."); ¶**212** ("SRM read these materially false and misleading representations in Bear's 2007 10-K, consistent with its practice of reading all of Bear's Form 10-K and 10-Q filings, and ***relied on these materially false and misleading representations in its analysis of Bear and in deciding whether it should retain its Bear investment***."); ¶**353** ("SRM read these materially false and misleading representations by Deloitte in Bear's 2006 and 2007 Form 10-K filings, as well as in each of Bear's 2007 Form 10-Q filings, consistent with its practice of reading all of Bear's Form 10-K and 10-Q filings immediately prior to and during the period it invested in Bear, and ***relied on these materially false and misleading representations in its analysis of Bear and in deciding whether it should liquidate, retain or increase its investment in Bear***."); ¶**522** ((Count I) "… ***Plaintiff would not have purchased Bear securities at the prices it paid, or at all***, if it had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements."); ¶**527** ((Count II) "… ***Plaintiff would not have purchased Bear common securities at the prices it paid, or at all***, if it had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements."); ¶**542** ((Count IV) "As a result of these misrepresentations and omissions, Defendants deceived Plaintiff regarding Bear's risk management and financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves, and thereby intentionally transformed Plaintiff's indecision about whether to sell or keep its Bear investment into ***a damaging decision to retain or increase its Bear investment***."); ¶**543** ((Count IV) "Plaintiff decided to purchase and retain its Bear securities in justifiable reliance on Defendants' fraudulent misrepresentations and omissions."); ¶**545** ((Count IV) "If Defendants had not made the misrepresentations and omissions alleged in this Complaint, ***Plaintiff would not have purchased additional Bear securities***.").

evidentiary matter in securities litigation. Indeed, courts of this district have stated that the application of Rule 9(b) … must not abrogate the concept of notice pleading." *In re Bear Stearns*, 763 F. Supp. 2d at 485 (citations and internal quotations omitted).

## V. SRM's COMPLAINT STATES A CLAIM UNDER SECTION 10(b).

### A. SRM's Section 10(b) Claims Are Not Time Barred.

#### 1. SRM's Complaint was timely filed under *American Pipe*.

An action under section 10(b) of the Exchange Act is subject to a five-year statute of repose or may be brought within two years after discovery of the facts constituting the violation. 28 U.S.C. §1658(b); *see Arco Capital Corp. Ltd. v. Deutsche Bank AG*, No. 12 Civ. 7270, 2013 WL 2467986, at *10 (S.D.N.Y. June 6, 2013) (Sweet, J.). A violation occurs on the date upon which the last alleged misrepresentation or omission was made. *Intesa Sanpaolo, S.p.A. v. Credit Agricole Corporate & Inv. Bank*, No. 12 Civ. 2683, 2013 WL 525000, at *6 (S.D.N.Y. Feb. 13, 2013) (Sweet, J.). In the present case, the last alleged misrepresentation or omission by Defendants occurred on or about March 12, 2008. ¶233.

The first of several securities fraud class actions against Bear was filed on March 17, 2008 alleging, *inter alia*, section 10(b) claims on behalf of a class of "all persons who purchased or otherwise acquired the common stock of [Bear Stearns] between December 14, 2006 and March 14, 2008," including SRM. *Eastside Holdings Inc. v. The Bear Stearns Cos. Inc.,* 08-cv-2739, Dkt. No. 1 (Complaint) (S.D.N.Y.) (Ex. A). This class complaint was filed just days after the last violation and years before the expiration of any applicable statutory period. A Consolidated Class Action Complaint was filed on February 27, 2009, on behalf of all persons who "purchased or otherwise acquired the publicly traded common stock or other equity securities" of Bear Stearns, which again included SRM. Ex. B. This Court certified a settlement

class by order of November 29, 2012, following notice to class members and affording them an opportunity to opt out. SRM submitted its opt-out request by letter of August 24, 2012, which also provided a detailed list of SRM's domestic purchases and sales of Bear equity securities during the Class Period. Counsel for Bear and Deloitte received a copy of SRM's request by email on or about August 30, 2012 and SRM's letter was filed with this Court on September 12, 2012. Ex. C. This Court approved SRM's opt-out request on November 29, 2012. Ex. D.

In *American Pipe*, the Supreme Court held that commencement of a class action tolled the running of the limitations period under the Clayton Act for all purported members of the class who made timely motions to intervene after the district court denied class certification. *Id.* at 553. In *Crown, Cork & Seal*, the Supreme Court extended *American Pipe* tolling to cover class members who file separate actions rather than seek intervention. 462 U.S. at 353-54. Once the statute of limitations has been tolled by the filing of a putative class action, it remains tolled for all members of the putative class until certification has been denied or the class member opts out. *Id.* at 352-54.

The *American Pipe* rule has been extended to statutes of repose. *See Asbestos*, 277 B.R. at 30-31 (Sweet J.) (citing cases). Consequently, under the *American Pipe* rule the five-year statute of repose applicable to SRM's 10(b) claims under 28 U.S.C. §1658(b)(2) began to run on March 12, 2008 (the date the last alleged misrepresentation or omission was made), but was suspended on March 17, 2008 (when the first Class Action was filed). The statute began to run again when this Court approved SRM's request to opt out of the class on November 29, 2012. SRM filed its Complaint on April 24, 2013, which was at least 4 years and 214 days before the statute would run under Section 1658(b)(2).

Defendants argue that *American Pipe* tolling is unavailable for SRM's 10(b) claims because (1) the Second Circuit's recent decision in *IndyMac* addressing the statute of repose under Section 13 of the Securities Act, should be extended to Section 1658(b)(2), a different statute under a different law, with different language and a different history; and (2) SRM's 10(b) claims based on its purchases of equity swaps were not asserted in the Class Action and therefore could not have been tolled. Both arguments are mistaken.

### 2. *IndyMac*'s holding with respect to §13 of the Securities Act does not apply to 28 U.S.C. §1658(b)(2), applicable to the Exchange Act.

In *IndyMac*, the Court of Appeals addressed the applicability of *American Pipe* tolling to the statute of repose under Section 13 of the Securities Act. 721 F.3d at 100; 112. The *IndyMac* court was not presented with and did not consider the statute of repose at issue here, Section 1658(b)(2), applicable to Section 10(b) of the Exchange Act. The distinction is important as Section 1658(b)(2)'s critically different wording and history compel a different result. In revising Section 1658(b) in 2002 as part of Sarbanes-Oxley, *American Pipe* tolling was statutorily enacted into the Exchange Act's limitations period. Thus, unlike Section 13 of the Securities Act, the Rules Enabling Act poses no impediment to *American Pipe* tolling of Section 1658(b)(2).

As noted by the Court of Appeals in *IndyMac*, Section 13's statute of repose states that "[i]n no event shall any such action be brought to enforce a liability … more than three years after the [underlying] security was bona fide offered to the public, or … more than three years after [its] sale." 721 F.3d at 107 (alterations in original) (emphasis added). The *IndyMac* district court also emphasized the "in no event" language in deciding that neither *American Pipe* tolling nor any other form of tolling could be invoked to avoid the three-year statute of repose in Section

13, which "by its terms allows no exceptions."[6]  793 F. Supp. 2d 637, 642-43 (S.D.N.Y. 2011)

(citing *Footbridge Ltd. Trust v. Countrywide Financial Corp.*, 770 F. Supp. 2d 618 (S.D.N.Y.

2011)).  The *Footbridge* court also concluded that application of *American Pipe* tolling would

violate the plain language of Section 13.  "Giving the words '[i]n no event' their ordinary

meaning precludes the application of *American Pipe* tolling."  770 F. Supp. 2d at 624 (citing

*Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385, 1391 (7th Cir. 1990) ("What other function

could be served by such language in a statute that starts the time on discovery?")).  "Simply put,

the words '[i]n no event' mean what they say."  770 F. Supp. 2d at 624.

 In contrast, Section 1658(b)(2) contains no such language.  The two-pronged limitations

period under Section 1658(b) simply states that a private right of action for securities fraud under

the Exchange Act "may be brought not later than the earlier of … (1) 2 years after discovery of

the facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. §1658(b).  The

overriding "in no event" language of Section 13 is not contained in Section 1658(b)(2).

 Section 1658's history is also critically different than Section 13's.  Under the re-

enactment doctrine, "Congress is presumed to be aware of an administrative or judicial

interpretation of a statute and to adopt that interpretation when it re-enacts a statute without

change."  *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009) (quoting *Lorillard v.

Pons*, 434 U.S. 575, 580 (1978)); *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010) ("We

normally assume that, when Congress enacts statutes, it is aware of relevant judicial

precedent.").  Congress is assumed to pass or amend legislation "with full knowledge of the

existing legal landscape."  *In re Northwest Airlines Corp.*, 483 F.3d 160, 169 (2d Cir. 2007)

---

[6]  Neither, of course, does the statutory period contained in Section 4B of the Clayton Act, 15 U.S.C. §15b ("Any action to enforce any cause of action under sections 15, 15a or 15c of this title shall be forever barred unless commenced within four years after the cause of action has accrued") which the Supreme Court found subject to tolling in *American Pipe*.  414 U.S. at 541-42.

(citing *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990)). Therefore, it is presumed that Congress' inclusion of the language from a statute incorporates the existing judicial interpretation of that language. *Lorillard*, 434 U.S. at 580-81 ("where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.").

Through 2002, at the time Sarbanes-Oxley was passed, federal courts had unanimously held that *American Pipe* tolling applied to the Exchange Act's statute of repose. *See Prieto v. John Hancock Mut. Life Ins. Co.*, 132 F. Supp. 2d 506, 519 (N.D. Tex. 2001) (filing of class action tolled 10b-5 statute of repose under *American Pipe*); *In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 600 n.11 (N.D. Ill. 1998) (same); *Salkind v. Wang*, 1995 WL 170122 at *3 (D. Mass. Mar. 30, 1995) (same). Indeed, the federal courts were unanimous in holding that *American Pipe* tolling applied to federal statutes of repose generally. *See, e.g., Joseph v. Wiles*, 223 F.3d 1155, 1167 (10th Cir. 2000) (*American Pipe* tolling applies to Securities Act statute of repose); *Asbestos*, 277 B.R. at 31; *and see In re Morgan Stanley Mortgage Pass-Through Certificates Litig.,* 810 F. Supp. 2d 650, 667 (S.D.N.Y. 2011) (majority of lower courts hold that *American Pipe* tolling applies to statutes of repose).

Accordingly, when Congress enacted Sarbanes-Oxley and re-enacted as Section 1658(b) the statutory periods of the Exchange Act (but not Section 13 of the Securities Act), it is presumed to have been aware of the "existing legal landscape," including the unanimous federal decisions applying *American Pipe* tolling to the statute of repose under the Exchange Act.[7]

---

[7]    Following passage of Sarbanes-Oxley virtually all lower courts continued to hold that *American Pipe* tolling applied to the statute of repose in Section 1658(b)(2). *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 159 (S.D.N.Y. 2012); *In re Merck Co. Sec. Litig.*, Fed. Sec. L. Rep. P 97,239 (D. NJ. Order of Dec. 12, 2012); *Hildes v. Andersen*, No. 08-cv-0008, 2010 WL 4811975, at *3 (S.D. Cal. Nov. 8, 2010); *In re Enron Corp. Sec.*, 465

This conclusion is supported by the fact that it was Congress' explicit intent not to make any substantive change to the "basic standards of the law on a statute of limitation." As Senator Leahy, one of Sarbanes-Oxley's sponsors, emphasized in the floor debate:

> **We are not suggesting changing in any way**—I want everybody to be clear on this—**we are not suggesting changing the basic standards of the law on a statute of limitation.** We are talking about extending the time. We are talking about extending the time so it will not be, as the Supreme Court said, with a short statute of limitations, a dead letter. We are saying we want enough of a statute of limitation—still very short but a long enough one so people can recover. We are perfectly willing to have exactly the same words as the law says now, with the exception the statute is slightly longer.

July 10, 2002 Floor Debate, 2002 WL 32054481, 29-30 (emphasis added). Reversing the unanimous view of federal courts that *American Pipe* tolling applied to the statute of repose under the Exchange Act would certainly have been a change to "the basic standards of the law on a statute of limitation" and run directly counter to Congressional intent as expressed by one of the bill's sponsors.

This conclusion is further confirmed by the fact that the Judiciary Committee Report (Additional Views) noted that the five-year limitation under Section 1658(b)(2) was not subject to equitable tolling, but made no such statement regarding legal tolling, *e.g.* under *American Pipe*. *See* Committee on the Judiciary Report, Additional Views (May 6, 2002), 2002 WL 32054437, at *26; *see Asbestos,* 277 B.R. at 31-32 (*American Pipe* tolling is "legal rather than equitable in nature"). *American Pipe* tolling of the Exchange Act's statute of repose was enacted into law without change by passage of Sarbanes-Oxley in 2002, and its application therefore does not implicate the Rules Enabling Act, rendering *IndyMac* inapposite.

---

F. Supp. 2d 687, 717-718 (S.D. TX. 2006); *Grubka v. WebAccess Intern., Inc.,* 445 F. Supp. 2d 1259, 1267 (D. Col. 2006); *Ballard v. Tyco Intern., Ltd.,* 2005 WL 1683598, at *6 (D. NH. July 11, 2005). *Cf. Merck,* 559 U.S. at 647 (noting that "not surprisingly" subsequent Courts of Appeal have continued to interpret §1658(b)(1) in accordance with the sense incorporated in that section as a result of Congress' re-enactment of that provision.). *But see Plumbers, Pipefitters & MES v. Fairfax Holdings,* 886 F. Supp. 2d 328, 334-335 (S.D.N.Y 2012) (declining to toll statute of repose under Section 1658(b)(2) where the court was "unable to find any indication that *American Pipe* tolling is legal, rather than equitable, tolling").

Additionally, there is nothing in Section 1658(b)(2) creating a "substantive" right different in kind from the right created by (b)(1): both give defendants the nominal right not to be sued with respect to claims beyond the stated limitations periods. *See generally United States v. Kubrick,* 444 U.S. 111, 117 (1979) (statutes of limitations embody a policy of repose); Corman, *Limitations of Actions,* (Ex. E) §1.3.2.1 at 30-31 (1991) (various definitions of statutes of repose include the following: (1) "it is merely one type of statute of limitation" that places a cap or outer limit on a statute; (2) "a statute of repose is considered distinct from a statute of limitation because it begins to run at a time unrelated to the traditional cause of action"). Both subsections of 1658(b) are subject to statutory tolling, *see Asbestos* at 32, that does not run counter to the Rules Enabling Act.

Moreover, as noted by the Supreme Court in *American Pipe*, the proper test for deciding whether tolling applies "is not whether a time limitation is 'substantive' or 'procedural' but whether tolling the limitation in a given context is consonant with the legislative scheme." 414 U.S. at 557-58. Consonant with the legislative scheme of the Exchange Act, tolling the statutory period upon filing of a class action does not compromise the purpose of statutes of limitation and repose under the Act. *See American Pipe*, 414 U.S. at 557-58; *Asbestos*, 277 B.R. at 32. As a member of the class, SRM was party to the Class Action when it was originally filed on March 17, 2008. *See American Pipe,* 414 U.S. at 551; *Asbestos*, 277 B.R. at 32. The pendency of the Class Action notified Defendants "not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs." *American Pipe,* 414 U.S. at 555; *see Asbestos*, 277 B.R. at 32. Furthermore, SRM's August 24, 2012 opt-out request gave Defendants specific details as to the nature and size of SRM's claims. (Ex. F). Accordingly, within the applicable statutory period suit was filed on SRM's behalf and

"Defendants had the essential information necessary to determine both the subject matter and size of the prospective litigation". *American Pipe,* 414 U.S. at 515; *Asbestos* 277 B.R. at 32 (the purposes of statutes of limitation and repose "are met when a class action is commenced") (quoting *Crown, Cork & Seal*, 462 U.S at 352). Section 1658(b)(2) demands no more and the purposes of "litigation efficiency and economy" that Rule 23 was designed to achieve require no less. 414 U.S. at 555-56. Tolling the statute of repose in Section 1658(b)(2) where, as here, the circumstances meet the requirements of *American Pipe*, is consonant with the legislative scheme of the Exchange Act and furthers the purpose of Rule 23. SRM's Complaint is timely.

### 3. SRM's claims based on its Bear swaps are subject to *American Pipe* tolling.

Defendants argue that regardless of the applicability of *American Pipe* tolling, SRM's Section 10(b) claims based on its Bear swaps were not tolled because these claims are "fundamentally different" from those asserted by the Class, that Defendants were thus unaware of the participants in or volume of the swap transactions such that "the Class Action failed to give defendants requisite fair notice." MTD at 13-15.[8] Defendants are incorrect.

As an initial matter, Defendants' argument that they had no notice of SRM's Bear swaps or their size is simply incorrect. On August 24, 2012 – nearly seven months before Defendants claim the statutory period had run – SRM sent a letter requesting to opt out of the settlement

---

[8] Defendants note that SRM's Bear swap transactions "may not be 'domestic transactions' to which the Exchange Act applies," MTD at 4, n.2 (citing *Morrison v. Nat'l Australia Bank Ltd.,* 130 S. Ct. 2869 (2010)), although they do not raise this as a basis for dismissal now. Regardless, as alleged, SRM's Bear swaps were functionally equivalent to the purchase of shares of Bear, which were traded on the New York Stock exchange. ¶¶13-14; s*ee Elliott Associates v. Porsche Automobile Holding SE*, 759 F. Supp. 2d 469, 476 (S.D.N.Y. 2010) (swap transactions functional equivalent of trading the underlying stock); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 323-324 (S.D.N.Y. 2011) (same). SRM purchased all of its Bear swaps by placing purchase orders with traders located in the U.S., who executed these orders in the U.S., resulting in SRM's incurring irrevocable liability in the U.S. Accordingly, SRM's purchases of Bear swaps were domestic transactions that took place in the U.S. ¶¶13-14. *See Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 67-68 (2d Cir. 2012) (buyer or seller incurring irrevocable liability in U.S. sufficient for domestic transaction).

class in the Class Action that detailed the date, security, quantity and price of each of its Bear swap transactions. This letter was sent to Defendants on or about August 30, 2012 and was filed with this Court on September 12, 2012. Ex. C. Accordingly, well within the statutory period, Defendants were informed of the quantities and prices of SRM's Bear swaps.

> **a.** ***American Pipe* tolls subsequent claims challenging the same underlying conduct as the Class Action.**

*American Pipe* tolling does not require that the claims in a subsequent individual action be identical to those brought in a prior class action. *See Cullen*, 811 F.2d at 719-721 (limiting *American Pipe* tolling to the identical causes of action would encourage "court congestion, wasted paperwork and expense"). Rather, there simply must be "sufficient commonality" between the claims and the evidence, memories and witnesses used to support them. *See Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 23 (2d Cir. 1994). This Circuit has repeatedly found claims even with different elements to be sufficiently common to permit *American Pipe* tolling. *See Cullen*, 811 F.2d at 720-21 (claims under New York's Civil Service Law and New York State Constitution tolled civil RICO claims); *Benfield*, 26 F.3d at 23 (claims under Commodity Exchange Act tolled civil RICO claims). Neither *Johnson*,[9] nor *New Oriental Education*,[10] nor *Crown, Cork & Seal*[11] are to the contrary. *American Pipe* tolling applies to

---

[9]  Contrary to Defendants, MTD at 13-14, *Johnson v. Railway Express Agency Inc.,* 421 U.S. 454 (1975) does not stand for the proposition that *American Pipe* tolling applies only where "exactly the same cause of action" is alleged in a subsequent suit." In *Johnson,* the Court found that *American Pipe* did not authorize the tolling of a limitations period based on (i) state law (ii) where no Rule 23 class action had ever been filed and (iii) where was no "significant underlying federal policy that would have conflicted with a decision not to suspend the running of the statute." *Id.* at 466-67. It is entirely inapposite here, where none of those three conditions obtain.

[10]  Contrary to Defendants, MTD at 13, *New Oriental Educ. & Tech. Grp. Sec. Litig.*, 2013 WL 1875102 at *4 (S.D.N.Y. May 6, 2013), merely stands for the proposition that *American Pipe* tolling does not apply to individual plaintiffs excluded from the purported class. *Id.* at *2. It is thus a simple application of the plain language of *American Pipe* that "the commencement of a class action suspends the applicable statute of limitations *as to all asserted members of the class* who would have been parties had the suit been permitted to continue as a class action." *American Pipe,* 414 U.S. at 550 (emphasis added).

SRM's swap-based claims, where the elements of the alleged violation, as well as the relevant evidence, memories and witnesses are the same as those alleged in the Class Action.

In *Cullen*, a state court class alleged that plaintiff county employees had been coerced by defendant officials to donate to the Nassau County Republican Party, in violation of state law. 811 F.2d at 704. After this action was dismissed, plaintiffs filed a federal action alleging First Amendment and civil RICO violations. *Id.* The Second Circuit considered whether the state-law class action had tolled plaintiffs' RICO claim under *American Pipe*. *Id.* at 707. Though the Second Circuit noted a number of elements of proof required for the RICO claim that were not present in the state law action, these differences did not matter because "no special preservation of witnesses or evidence would ordinarily be necessary" regarding them. *Id.* at 721. The key issue, according to the Court, lay in the commonality of defendants' alleged *conduct*:

> The challenged conduct is what is common to both the RICO and the state-law claims, and that is what the defendant must be alerted to in order to preserve its evidence, record its recollections, and keep track of its witnesses. The state court complaint clearly challenged the conduct that is at issue here, and we would be hard pressed to conclude that that complaint was not sufficient to alert the defendants sued there to preserve the evidence regarding that conduct.

*Id.* Here, Defendants do not dispute that *American Pipe* tolling could apply to SRM's 10(b) claims based on its Bear stock transactions. Defendants only argue the inapplicability of *American Pipe* tolling to claims based on SRM's swap transactions. MTD at 13. But SRM's Bear swaps are total return swaps which mimic all aspects of a stock as though the stock had been purchased itself. There is no issue of Defendants' preserving different evidence because some of SRM's damages are based on swap transactions.

---

[11] Defendants cite *Crown, Cork & Seal*, 462 U.S. at 354, for a general statement regarding the dangers of over-extension and "abuse" of *American Pipe*'s tolling doctrine, MTD at 14, but that case confirms that *American Pipe* tolling is proper where, as here, the claims in the second suit "concern the same evidence, memories, and witnesses as the subject matter of the original class suit." 462 U.S. at 355.

Similarly, in *Benfield,* the Second Circuit found that evidence relating to the common "underlying fraudulent acts" allowed a class action's claims under the Commodities Exchange Act and for common law fraud to toll subsequent civil RICO claims. *Benfield*, 26 F.3d at 23. Here, Defendants do not claim – nor could they – that there is any difference in the "underlying fraudulent acts" alleged, or the Defendants' evidence or witnesses relating to them, depending on whether SRM's Section 10(b) claims are based on SRM's stock or swap transactions.

        **b.**       **Defendants' argument that swap transactions are "fundamentally different" for purposes of *American Pipe* tolling is mistaken and inconsistent with the position Defendants took in the Class Action.**

Defendants argue that *Cullen* is inapplicable here because swap transactions are "substantively different" from stock transactions. MTD at 14. n.8. First, as discussed above, under *Cullen* (and *Benfield*) the key issue is the commonality of Defendants' conduct. Even if there were material differences between stocks and swaps, they are irrelevant because the conduct SRM challenges is identical to that challenged in the Class Action.

Second, SRM's shares of Bear common stock and SRM's Bear swaps are functionally equivalent. *See Elliott*, 759 F. Supp. 2d at 476 (court utilized an "economic reality" test to determine that equity swaps based on the value of Volkswagen shares were the "functional equivalent of trading the underlying VW shares"); *Valentini*, 837 F. Supp. 2d at 323-324 (same).

Third, Defendants' current position is contradicted by the fact that Defendants previously sought and obtained the release of swap-based claims as part of their settlement of the Class Action. The June 25, 2012 Class Notice purported to release, against all Defendants, claims "that relate to the purchase of the publicly traded common stock **or other equity securities**…of Bear Stearns during the Class Period." Ex. G at 7 (emphasis added). The Class Notice, sent to class members well after the enactment of Dodd-Frank, which specifically includes equity swaps

as "securities", 15 U.S.C. 78c(a), thereby purported to release swap-based claims. The release was approved in this form. Swap-based claims were properly included in the scope of the release for the Class Action only if swap-based claims hinge on the "identical operative factual predicate" or if there is a "realistic identity of issues" between the issues settled in the Class Action and the subsequent swap-based claims it purports to release. *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460-61 (2d Cir. 1982). Having sought and obtained a release that includes swap-based claims as part of the Class Action settlement, Defendants should not now be heard to argue that these swap-based claims are so "fundamentally different" from the rest of the Class claims that they were not tolled by the Class Action.

**B.      SRM States a Section 10(b) Claim Based on Its Bear Swap Transactions.**

**1.      The CFMA expanded Section 10(b) and Rule 10b-5 to reach "any securities-based swap agreement" (even while excluding such swaps from the definition of "security").**

In the Commodities Futures Modernization Act of 2000, Congress expanded the scope of section 10(b) of the Exchange Act and rules promulgated thereunder to cover any "securities-based swap agreement" as defined under the Gramm-Leach-Bliley Act of 1999. *Caiola*, 295 F.3d at 327 (CFMA "amend[ed] Section 10(b) to reach swap agreements."); 15 U.S.C. §78j(b) (applying to "[r]ules promulgated under [§10(b)] … that prohibit fraud"). As explained above, p. 17, 20, SRM's swap transactions are the functional equivalent of Bear stock and are "security-based" swap agreements under CFMA. [12] Accordingly, SRM's swap transactions are covered by Section 10(b) and Rule 10b-5, *Caiola*, 295 F.3d at 327 (acknowledging that after CFMA, Rule 10b-5 "clearly" covered security-based swap transactions), and SRM is entitled to bring a 10b-5 action with respect to these transactions.

---

[12] Defendants do not dispute that SRM's swap transactions are security-based swap agreements.

Defendants argue that while CFMA expanded Section 10(b) to give the SEC enforcement authority over security-based swap agreements, it did not alter the scope of Rule 10b-5's private right of action. MTD at 11. This is contrary to the plain language of the statute, *see* 15 U.S.C. §78j(b) ("Rules promulgated under subsection (b) of this section that prohibit fraud… shall apply to security-based swap agreements to the same extent as they apply to securities."), and Second Circuit authority. 295 F.3d at 327 (the extension of 10(b) to swap transactions "clearly" brought with it the private right of action under 10b-5).[13]

### 2. Section 10(b) and Rule 10b-5 reach fraud "in connection with" the purchase or sale of a covered instrument.

Defendants argue that any private right of action under Section 10(b) based on a swap transaction should be limited to "persons directly involved in swap transactions." MTD at 12. Defendants cite no authority for this proposition, which is inconsistent with CFMA's purpose. *See Elliott*, 759 F. Supp. at 475. The Second Circuit has long held that it is unnecessary for a defendant to actually participate in the transaction in order to be liable under Section 10(b) so long as the defendant was engaged in fraudulent conduct "in connection with" the purchase of a covered instrument. *See, e.g., In re Ames Dept. Stores Inc. Stock Litig.*, 991 F.2d 953, 964-966 (2d Cir. 1993) (reversing dismissal of Section 10(b) claims and finding that alleged misrepresentations made in connection with reset note and debenture prospectuses were "in connection with" plaintiffs' purchases of common stock). It is enough that the fraud "coincides" with the purchase or sale of a covered instrument—whether or not the defendant is the seller. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 85 (2006); *O'Hagan,* 521

---

[13] *See Elliott*, 759 F. Supp. 2d at 475 (S.D.N.Y. 2010) (purpose of CFMA "was to allow current and future anti-fraud rules [to] apply to swap agreements to the same extent as they do to securities") (alteration in original) (internal quotations omitted); *SEC v. Rorech*, 720 F. Supp. 2d 367, 406 (S.D.N.Y. 2010) (in CFMA, "Congress extended section 10(b) and Rule 10b-5's anti-fraud rules to 'security-based swap agreements'") (citing 147 Cong. Rec. S11946-01 (daily ed. Jan 2, 2001) (statement of Sen. Sarbanes)).

U.S. at 658 (the requisite showing is "deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller").

Deloitte argues that its audit opinions in Bear's SEC filings were "in connection with" SRM's stock transactions but not SRM's swap transactions, because Deloitte did not consent to the use of its audit opinions for the offering of swaps.  Defendant Deloitte & Touche LLP's Memorandum of Law in Support of its Motion to Dismiss the Complaint ("Deloitte MTD") at 3-5.  However, the "in connection with" requirement is satisfied where an investor purchases or sells in reliance on false or misleading statements disseminated "in a manner reasonably calculated to influence the investing public, e.g., by means of the financial media."  *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968) (*en banc*); *In re Ames*, 991 F.2d at 963-965 (same); *In re Leslie Fay Cos., Inc. Securities Litig.*, 871 F. Supp. 686, 695-698 (S.D.N.Y. 1995). Deloitte consented to the publication of its audit opinions in Bear's SEC filings, which were reasonably calculated to influence the investing public, including investors in Bear security-based swaps such as SRM.  This clearly satisfies the "in connection with" requirement.  *In re The Leslie Fay Cos., Inc.*, 871 F. Supp. at 694-96 (outside auditors' certification of a company's financial statements were "in connection with" the purchase or sales of securities since investors were likely to rely on them).  No specific consent with respect to each offering is required.[14]

### 3. Dodd-Frank independently authorizes SRM's Section 10(b) claim.

As set forth above, the 2002 CFMA authorizes SRM to bring a private right of action based on its swap transactions.  While that is sufficient to sustain SRM's claims, Dodd-Frank

---

[14]   Deloitte's authority is not to the contrary.  The auditors in *Chemical Bank v. Arthur Anderson & Co.*, 726 F.2d 930, 943 (2d Cir. 1984) did not provide an opinion on the company whose stock drop damaged plaintiffs.  The auditors in *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 189-190 (7th Cir. 1993) did not authorize the publication of their financial statements at all.  Deloitte's only other cited authority supports SRM's claim, *In re Leslie Fay*, 871 F. Supp. 686 (rejecting argument based on *Chemical Bank* and *Frymire-Brinati* that auditor's opinion was too remote to be "in connection with" purchase of securities).

also provides an independent alternative. In 2010, as part of Dodd-Frank, Congress included security-based swaps in the definition of a security under the Exchange Act. 15 U.S.C. §78(c)(10). Defendants argue that Dodd-Frank should not be applied retroactively. MTD at 10 n.6. However, "retroactivity concerns do not come into play" in applying Dodd-Frank to earlier transactions previously governed under CFMA because Dodd-Frank was a mere clarification of what was already in CFMA. *See Leshinsky v. Telvent* GIT*, S.A.*, 873 F. Supp. 2d 582, 590-591 (S.D.N.Y. 2012) (finding that Dodd-Frank clarified certain provisions of Sarbanes-Oxley). Where an amendment merely clarifies existing law, it may be applied retroactively. *See, e.g., Levy v. Sterling Holding Co. LLC*, 544 F.3d 493, 506-08 (3d Cir. 2008) (application of new rule to pre-promulgation conduct would have no impermissible retroactive effect because changes were "clarifying" rather than "substantive"); *Cookeville Regional Medical Center v. Leavitt*, 531 F.3d 844, 849 (D.C. Cir. 2008) (since subsequent legislation clarified earlier law, "it follows that there is no problem of retroactivity"). And "when an amendment alters, even significantly alters, the original statutory language, this does not necessarily indicate that the amendment institutes a change in the law." *Brown v. Thompson,* 374 F.3d 253, 259 (4th Cir. 2004) (holding no issue of retroactivity where amendments were clarifying) (internal quotations omitted).

## VI. SRM'S COMPLAINT STATES A CLAIM UNDER SECTION 18.

Defendants argue that SRM's claim under section 18 of the Exchange Act is time barred, either (1) under *IndyMac* or (2) because Section 18 claims were not brought in the Class Action. Both arguments are mistaken. *IndyMac* addressed only *American Pipe* tolling of the statute of repose under Section 13 of the Securities Act. As discussed above, there is no basis for extending *IndyMac*'s holding to a different limitations period under a different statute where statutory tolling is consonant with the legislative scheme. *See* p. 13-15, *supra.*

Defendants' argument that *American Pipe* does not toll the statute of limitations for SRM's Section 18 claims because the Class Action did not bring Section 18 claims, MTD at 17, is incorrect as a matter of law and inconsistent with the fact that Defendants previously sought and obtained the release of claims brought under Section 18 as part of their settlement of the Class Action. First, *American Pipe* tolling applies to SRM's Section 18 claims because those claims arise from the same conduct by Defendants challenged in the Class Action, which is the applicable standard in this Circuit. *See* p. 18-20, *supra*; *Cullen*, 811 F.2d at 721. Second, the Class Notice purported to release, against all Defendants:

> any and all claims … [which Lead Plaintiff] could have asserted in the Action or any other action or in any form, that arise out of, relate to, or are in connection with the claims, allegations, transactions, facts, events, acts, disclosures, statements, representations or omissions or failures to act…referred to in the complaints filed in the Action and that relate to the purchase of the publicly traded common stock or other equity securities…of Bear Stearns…

This release includes SRM's Section 18 claims, which arise from the same conduct alleged in the Class Action. Section 18 claims were properly included in the scope of the release only if those claims hinge on the "identical factual predicate" or have a "realistic identity of issues" with those settled in the Class Action. *TBK Partners,* 675 F.2d at 460-61. Having sought and obtained a release of such claims, Defendants should not now be heard to argue that Section 18 claims cannot be tolled because they were not brought in the Class Action. *See* p. 20-21, *supra*.

Deloitte argues that SRM's Section 18 claim against Deloitte is untimely notwithstanding *American Pipe* tolling because the statute of limitations on that claim was not tolled until the Consolidated Class Action Complaint first named Deloitte as a defendant in the Class Action on February 27, 2009, by which time Deloitte claims that 11 months and 11 days of Section 18's one-year statute of limitations had already run. Deloitte MTD at 7. This is incorrect. SRM was not on notice of its Section 18 claim against Deloitte until the September 25, 2008 publication of

the OIG Report in which the SEC revealed for the first time the red flags that Deloitte had knowingly or recklessly ignored in providing its "clean opinions" on Bear's SEC filings. *See* p. 7, *supra*. (This is why Deloitte was not named as a defendant in the Class Action until after the publication of the OIG report.) Accordingly, when the Consolidated Class Action Complaint was filed, only five months and two days of the statute of limitations had run. That statutory period was then tolled until SRM's opt-out request was approved by this Court on November 29, 2012. SRM filed its Complaint on April 24, 2013, less than five months later. Accordingly, when SRM initiated this action, there remained at least two months before the statute of limitations would run and more than two years were left before the statute of repose would run.

Defendants argue that SRM has failed to state a Section 18 claim because SRM's allegations sound in fraud but SRM does not plead reliance with sufficient particularity to satisfy Rule 9(b). MTD at 17. This is incorrect. SRM's Section 18 claim sounds in negligence.[15] SRM expressly disavows any claim of fraudulent or intentional conduct in connection with its Section 18 claim and thus Rule 9(b) does not apply. ¶524; *see In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 483 (S.D.N.Y. 2005) (Rule 9(b) applied only because the Section 18 claim was characterized as sounding in fraud); Thomas Lee Hazen, 4 *Law of Securities Regulation* (Ex. H) §§2:13[1][B][4]; 12:18[4] (6th ed. 2009); *see also Int'l Broad. Corp. v. Turner*, 734 F. Supp. 383, 391 (D. Minn. 1990) (applying Rule 8 to Section 18 claim).

## VII. SRM'S COMPLAINT STATES A CLAIM FOR COMMON LAW FRAUD UNDER NEW YORK LAW.

### A. SRM's Complaint Pleads Actual, Justifiable Reliance.

Defendants contend that SRM's allegations of reliance are subject to the particularity requirements of Rule 9(b) and that they fail to meet that heightened pleading requirement. MTD

---

[15] Defendants have identified no case in which Rule 9(b) was held to apply to a Section 18 claim sounding in negligence. In any event, SRM alleges fraud with the particularity required by Rule 9(b). *See* p. 27-29, *infra*.

at 19.  Defendants are mistaken.  First, SRM's allegations of reliance are evaluated under the notice pleading standard of Rule 8.  Rule 9(b) by its terms requires only that the "circumstances *of the fraud*" be pled with particularity, not that each and every element of a claim sounding in fraud must be pled with particularity.  Fed. R. Civ. P. 9(b) (emphasis added).  Moreover, the Rule expressly provides that "conditions of a person's mind may be alleged generally."  *Id.*  A plaintiff's reliance – that he or she believed a defendant's misrepresentations and but for those misrepresentations and omissions would have acted otherwise – constitutes "conditions of a person's mind."  Thus, recognizing that Rules 8 and 9(b) must be read in conjunction with each other, courts have held that while misrepresentations must be pled with particularity, other elements of a fraud claim, such as damages, reliance, or a defendant's state of mind, need only satisfy Rule 8's notice pleading standard.  *See, e.g., Indiana Bell Tel. Co. v. Ward*, No. IP 02-170-C H/K, 2002 WL 32067296 (S.D. Ind. Dec. 6, 2002) (citing Wright & Miller, *Federal Practice and Procedure:* Civil 2d §1298 (1990)); *see also In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 335, 348 (S.D.N.Y. 2007) (Sweet, J.) (recognizing the interplay between Rules 8 and 9(b) and holding that the Rule 8 standard applies to loss causation allegations in a securities fraud action).[16]

Regardless of whether Rule 8 or Rule 9(b) governs SRM's pleadings of reliance, SRM's reliance allegations are sufficient.  This Court and the Second Circuit have repeatedly recognized the sufficiency of such allegations, even where heightened pleading standards apply.  For instance, in *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 414, 424 (S.D.N.Y. 2010), this Court held that, "In pleading reliance, Plaintiffs need only allege that 'but for the claimed

---

[16] Admittedly, scattered decisions (including decisions of this Court) have suggested that 9(b)'s particularity requirement applies to allegations of reliance.  However, the Second Circuit has never applied Rule 9(b) to allegations of reliance, however, and as discussed further in the text, has not required particularity with respect to allegations of transaction causation, which is simply reliance by another name.

representations or omissions, the plaintiff would not have entered into the detrimental securities transactions." The Second Circuit has frequently held that "transaction causation" – in other words reliance[17] – "only requires allegations that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (same); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir. 2003) (same).[18] SRM's allegations plainly meet this standard.[19]

SRM alleges reliance on a number of specific material misrepresentations and omissions in Bear's SEC filings and public statements. *See* p. 8-9, *supra.* SRM specifically alleges that it *read* each of these misrepresentations consistent with its practice of reading all of Bear's 10-K and 10-Q filings immediately prior to and during the period it invested in Bear, beginning at least as early as Bear's 2006 10-K. *See* p. 8-9, *supra.* SRM further alleges that it *relied* on the specific misrepresentations and omissions identified in the Complaint in deciding to purchase

---

[17] The "element of reliance is often described as 'transaction causation.'" *Healthcare Fin. Grp., Inc. v. Bank Leumi USA*, 669 F. Supp. 2d 344, 348 (S.D.N.Y. 2009). *Accord Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341, (2005) ("*reliance,* often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'"); *ATSI Commc'ns, Inc.*, 493 F.3d at 106 ("A plaintiff is required to prove both transaction causation (also known as reliance) and loss causation").

[18] Such allegations' sufficiency is recognized in Defendants' own cited authority. *See In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 489-90 (S.D.N.Y. 2006) (quoting *Lentell* and *Emergent Capital*).

[19] Defendants' cases are readily distinguished and not to the contrary. *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F. Supp. 1199, 1221 (S.D.N.Y. 1994) denies that there is a presumption of reliance in common law fraud claims – a presumption SRM does not claim. *Turtur v. Rothschild Registry, Int'l, Inc.*, No. 91 v. CIV. 6222, 1993 WL 338205 at *6 (S.D.N.Y. Aug. 27, 1993) does not establish a pleading standard but rather what was required "[t]o succeed on a claim for common law fraud." In *Granite Partners, L.P. v. Bear Stearns & Co. Inc.,* 58 F. Supp. 2d 228, 258-59 (S.D.N.Y. 1999) (Sweet, J.), the Court found the reliance allegations inadequate on the grounds that those allegations – unlike SRM's allegations -- were made exclusively "on information and belief." In *Int'l Fund Mgmt. S.A. v. Citigroup Inc.,* 822 F. Supp. 2d 368, 387 (S.D.N.Y. 2011), plaintiffs' reliance allegations, unlike SRM's, failed to identify the particular misrepresentations or omissions relied upon. Defendants cite *Devaney v. Chester,* 709 F. Supp. 1244, 1264 (S.D.N.Y. 1989) as requiring that a plaintiff identify the person who read the misrepresentation on plaintiff's behalf. *Devaney* has never been cited for such a requirement by any court in the 24 years since it was decided, and such a requirement would be inconsistent with more recent decisions of this Court. *See, e.g., Anwar,* 728 F. Supp. 2d at 424.

and later to retain its Bear securities and that it would not have purchased or retained these securities but for these misrepresentations and omissions. *See* p. 8-9, *supra*. Moreover, SRM explained its reliance on the identified misrepresentations and omissions by alleging that the subjects on which Bear misrepresented and omitted the truth were very important to SRM's evaluation of Bear. *See* p. 4, *supra*. These specific allegations of reliance are sufficient to plead common law fraud.

Defendants argue that SRM does not allege the date and number of shares purchased in reliance on the misrepresentations and omissions identified in Bear's 2006 10-K. MTD at 18. There is no requirement that SRM allege those details and Defendants cite no authority establishing one. Defendants also fail to recognize that every SRM purchase of Bear securities was in reliance on the specific misrepresentations and omissions identified in the Complaint.

Defendants also argue, MTD at 20-21, that any reliance pleaded by SRM was not justified because SRM is a "highly sophisticated" investor that takes a "contrarian" approach and so "could not reasonably have relied" on the alleged misrepresentations and omissions. As noted above, as a sophisticated and contrarian investor SRM was especially reliant on honest, accurate financial reporting and therefore particularly vulnerable to Defendants' fraud. *See* p. 3-4, *supra*. While a "contrarian" investor may invest in a company even in the face of bad news, Defendants repeated misrepresentations and omissions concealed the truth that things were far worse at Bear than any of its disclosures reflected. SRM justifiably relied on Defendants' misrepresentations and omissions regarding, among other things, Bear's asset valuations, risk management and modeling, GAAP violations, BSAM writedowns and liquidity, all of which are such that a reasonable investor would consider them to significantly alter the "total mix" of information made available about Bear and material to an investment decision. *See In re Bear Stearns*, 763

F. Supp. at 488; ¶¶49-50, 174, 211 (asset valuations); 193-96 (risk management and modeling); 288-343 (GAAP violations); 95-160, 210 (BSAM writedowns); 147-149 (liquidity).

Moreover, even a sophisticated investor's reliance is justified when it is based on defendants' misrepresentations and omissions of information that is peculiarly within defendants' knowledge and not readily available to SRM. ¶¶22, 49, 53, 529, 530, 539 (misrepresentations and omissions concerned facts "peculiarly within the knowledge of Defendants and which were not readily available to Plaintiff."); *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541-42 (2d Cir. 1997) (plaintiff may rely on representations relating to matters peculiarly within defendant's knowledge); *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.,* No. 03 CIV. 3748, 2006 WL 278138, at *8-9 (S.D.N.Y. Feb. 2, 2006) (sophisticated investor justifiably relied where "[p]laintiff read the reports given to them" but Defendants "omitted information from those reports that should have been included").

**B.     SRM's Fraud Claims Are Not Time Barred.**

Defendants argue that *American Pipe* tolling does not apply to the statute of limitations on SRM's common law fraud claims. MTD at 22-23. This is incorrect. The New York courts have not yet spoken authoritatively on this issue, but there is no reason to think that the very policies underlying *American Pipe* tolling – *viz.,* that class-action tolling promotes judicial efficiency and is consistent with the purposes of statutory periods – would be irrationally disregarded. *See Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 515-16 (S.D.N.Y. 2001) (Sweet, J.) (finding "it is not clear what interests a state … has in not having its tolling rule applied" to state claims during the pendency of a class action in federal court since without such tolling, there would be a "great incentive" for individual class members to file independent state-law actions during the pendency of the class action which would "militate against the judicial

economy which is one of the goals of federal class action procedure.").  Indeed, the New York

courts have shown that they seek to advance these policies through *American Pipe* tolling.

*Cullen*, 811 F.2d at 719 ("New York courts have, in the interest of avoiding 'court congestion,

wasted paperwork and expense,' long embraced the principles of *American Pipe*.").

Defendants' argue that *American Pipe* does not toll the statute of limitations for SRM's

common law fraud claims because the Class Action did not bring common law fraud claims,

MTD at 23-24.  But this argument fails for the same reasons it did with respect to SRM's Section

18 claim – *viz.,* it is incorrect as a matter of law, *see Cullen*, 811 F.2d at 721, and inconsistent

with the fact that Defendants previously sought and obtained the release of common law fraud

claims as part of their settlement of the Class Action.  *See* p. 20-21, *supra*.

In any event, SRM's common law fraud claim is timely even without *American Pipe*

tolling.  Under New York law, the statute of limitations for SRM's common law fraud claim is

six years.  *See* N.Y. CVP. LAW §213(8); *Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (N.Y. 2009).

Thus, SRM's common law fraud claim is time barred only if SRM failed to allege any

misrepresentations or omissions on or after April 24, 2007 (the date six years before SRM filed

its Complaint) as a basis for its action for common law fraud.

Defendants' argument that SRM's claims are premised "almost exclusively" on

"supposed wrongdoing prior to April 23, 2007," MTD at 22, concedes the point that not all of

them are.  *See* p. 8-9*,* (identifying misrepresentations alleged at ¶¶171, 172, 174, 176, 193, 195,

197, 202, 203, 210, 211, 345 and 346, which occurred during or after October 2007).

Consequently, SRM's common law fraud claim is timely.

Defendants also argue that SRM's reliance on the OIG Report is improper because the

Report refers to events that occurred prior to April 24, 2007, particularly the SEC's criticism of

Bear's "VaR" models in 2005 and 2006. MTD at 22. Here, Defendants repeat arguments that this Court has previously rejected in the Class Action:

> Although the Defendants emphasize that the SEC's criticisms of Bear Stearns' mortgage and VaR models occurred before the Class Period commenced, the Securities Complaint alleges that Bear Stearns never adopted the necessary changes to its mortgage and VaR models, and that it was not until toward the end of 2007 that the Bear Stearns Defendants attempted to respond to the SEC's concerns.

*In re Bear Stearns,* 763 F. Supp. 2d at 490. SRM made the same allegations. *See, e.g.,* ¶¶51, 380. Bear continued to misrepresent and omit the deficiencies of and its lack of control over its mortgage and VaR models until Bear collapsed. *See, e.g.,* ¶¶60, 67, 71, 91, 127, 172, 193. These are precisely the same allegations this Court has previously found sufficient to defeat Defendants' motion to dismiss. *In re Bear Stearns,* 763 F. Supp. 2d at 489.

Deloitte argues that SRM's common law fraud claim against Deloitte is time barred because Deloitte's unqualified opinion on Bear's 2006 10-K was published more than six years before SRM filed its Complaint.[20] Deloitte MTD at 10-11. As alleged, Deloitte consented to Bear's including in each of its 2007 10-Q filings Deloitte's reaffirmation of the unqualified opinion Deloitte offered in Bear's 2006 10-K. *See, e.g.,* ¶346; 3Q 2007 10-Q at 33. Thus, SRM's common law fraud claim based on Deloitte's reaffirmations of its unqualified opinion after April 24, 2007 is undisputedly timely.

In addition, in Bear's third-quarter 2007 10-Q, Deloitte offered the following opinion without any qualification:

> Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

3Q 2007 10-Q at 33. Deloitte provided this opinion in a letter dated October 9, 2007 which also

---

[20] It is undisputed that SRM's common law fraud claim is timely brought based on Deloitte's 2007 audit opinion.

reaffirmed Deloitte's unqualified opinion on Bear's 2006 10-K. *Id.* However, as SRM alleges, in September 2007, the SEC raised a red flag for Deloitte concerning Bear's 2006 10-K when it informed Bear that Bear was required to provide more information about its exposure to subprime investments. As SRM alleges, while the resolution of this letter pertained to the 2006 Form 10-K, Deloitte had been put on notice that these disclosures were required in Bear's subsequent SEC filings. ¶¶391-392. Deloitte is liable to SRM for, among other things, knowingly or recklessly ignoring the red flags identified in the Complaint, *see* p. 7, *supra*, reaffirming its 2006 10-K unqualified opinion and certifying that it was "not aware" of any required material modifications in Bear's third-quarter 2007 10-Q. *See In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp. 2d 258, 303-04 (S.D.N.Y. 2011) (auditor found liable despite qualifying language in a quarterly statement).[21]

### C. SRM's Holder Claims are Actionable Under New York Law.

New York law has long recognized holder fraud claims. *See Continental Ins. Co. v. Mercadante*, 222 A.D. 181, 183 (N.Y. App. Div. 1 Dept. 1927) ("The gravamen of the action is for fraud in inducing, not the purchase of the bonds, but their retention after purchase"; "plaintiffs cannot be denied redress because their conduct was inaction, rather than action"). As this Court has repeatedly affirmed, "Unlike federal securities law, New York common law in certain circumstances allows a plaintiff to recover on a fraud claim where the plaintiff was injured because he or she *held*, rather than bought or sold, securities in reliance on defendants' misrepresentations." *Prime Mover Capital Partners, L.P. v. Elixir Gaming Tech., Inc.,* 793 F.

---

[21] The sole authority Deloitte cites in its support, *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 815 F. Supp. 620, 669 (S.D.N.Y. 1993), is irrelevant because that case involved a plaintiff who was allegedly relying on the opinion that a quarterly statement was in accordance with GAAP, an opinion the auditor had expressly disclaimed. Here, SRM alleges reliance on Deloitte's reaffirmation of its 2006 10-K unqualified opinion and its certification that it was not aware of any material modifications required for the third-quarter 2007 10-Q –not on a GAAP-compliance opinion Deloitte disclaimed making.

Supp. 2d 651, 672 n.108 (S.D.N.Y. 2011) (emphasis in original); *see Primavera*, 130 F. Supp. 2d at 501 (investors "may bring claims based on fraudulent inducement to retain their investments.").

Citing *Starr Foundation v. AIG, Inc.*, 76 A.D.3d 25, 28-29 (NY App. Div. 1st Dept. 2010), Defendants mistakenly claim that "holder claims are barred under New York law." In fact, *Starr Foundation* barred only a lost profits measure of damages for holder claims. *Matana v. Merkin*, No. 13 CIV. 1534, 2013 WL 3940825, at *11 (S.D.N.Y. July 30, 2013) (In *Starr Foundation*, the "Appellate Division, First Department, has recently held that New York law does not recognize a holder claim *seeking to recover lost profits.*") (emphasis added). The *Starr Foundation* court "reasoned that such a claim is at odds with New York's 'out-of-pocket rule,' under which the measure of damages for fraud is 'to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained.'" *Id.* (quoting *Starr Foundation,* 76 A.D.3d at 27). As this Court recently recognized in *Mantana*, rather than extinguishing holder claims recognized for decades under New York law:

> *Starr* assumed the continuing validity of *Continental Insurance Co. v. Mercadente* ...which upheld a claim by plaintiffs that they had been fraudulently induced to retain an investment that ended up substantially worthless. *Starr* distinguished *Mercadente* on the ground that the plaintiffs in *Mercadente* were seeking to recover an out-of pocket loss – *i.e.,* their entire investment – whereas plaintiffs in *Starr* sought to recover the value of profits they might have reaped had they sold the securities earlier.

*Id.* The Second Circuit relied on *Mercadante* for the proposition that New York law recognizes holder claims. *See Weinberger v. Kendrick*, 698 F.2d 61, 78 (2d Cir. 1982). *Starr Foundation* has no application here, where SRM seeks to recover its out-of-pocket loss of the money it invested and lost because of the fraud, not lost profits. ¶243. *See Primavera*, 130 F. Supp. 2d at 505-07 (in holder claim, out-of-pocket rule provides that measure of damages is "the difference

between the amount invested and the value of the[] securities once the fraud was revealed.")[22]

### D. Deloitte is Liable for Common Law Fraud Based on SRM's Swap Transactions.

Deloitte argues that it cannot be liable for common law fraud based on SRM's swap transactions on the grounds that Deloitte had reason to expect these transactions would be influenced by its audit opinion. Deloitte MTD at 11-13. This is implausible on its face. At least as early as 2000, federal securities laws covered security based swaps just as they did common stock and other registered securities that Deloitte certainly expected to influence. *See* p. 21-24, *supra.* A sophisticated auditor such as Deloitte certainly had reason to expect that their opinions published in Bear's SEC filings would influence security-based swap investors as well.[23]

## VIII. SRM'S COMPLAINT STATES A CLAIM UNDER SECTION 20(a).

Defendants argue that SRM's Section 20(a) claim should be dismissed on the sole grounds that SRM has failed to allege an underlying violation of the Exchange Act. MTD at 25. As set forth above, SRM alleges violations of the Exchange Act. Accordingly, Defendants' motions should be denied.

### CONCLUSION

For all of the reasons set forth above, SRM respectfully requests that the Court deny Defendants' Motions to Dismiss.

---

[22] The other cases Defendants rely on are not to the contrary. *See Tradex Global Master Fund SPC LTD v. Titan Capital Group III, LP*, 95 A.D.3d 586 (NY App. Div. 1st Dept. 2012), (plaintiffs seeking to recover lost profits); *Irvin v. Jones,* No. 3942-12, 2012 WL 6634476, at *11 (N.Y. Sup. Ct. Dec. 13, 2012) ("'out-of-pocket rule' limits the recovery of damages for fraud to the actual pecuniary loss sustained" and excludes recovery for lost profits).

[23] Deloitte cites authorities which do not support its position. First, the example Deloitte quotes from the Restatement (Second) of Torts supports SRM's position by establishing that even a $10,000 mortgage and a $20,000 mortgage secured with the same land are the same type of transaction. Here, there is no economic distinction between the total return swaps based on Bear's stock and the shares of Bear stock they mimicked. *See Elliott*, 759 F. Supp. 2d at 476; *Valentini*, 837 F. Supp. 2d at 323-324 (same). Second, Deloitte cites a Texas case holding that an auditor has no reason to expect that, when it audited company A, it would influence purchasers of notes issued by company B. Of course, here SRM's Bear swaps were based on shares of Bear stock, not those of another company.

Dated:  September 4, 2013

Respectfully submitted,

BOIES SCHILLER & FLEXNER LLP

By:    /s/Philip C. Korologos
        Philip C. Korologos
        575 Lexington Avenue
        New York, NY 10022
        Phone: (212) 446-2300
        Fax: (212) 446-2350

        Richard B.  Drubel
        Matthew J.  Henken
        BOIES, SCHILLER & FLEXNER LLP
        26 South Main Street
        Hanover, NH 03755
        Phone:  (603) 643-9090
        Fax:  (603) 643-9010

        George A.  Zelcs
        KOREIN TILLERY LLC
        205 North Michigan Plaza
        Suite 1950
        Chicago, Illinois 60601
        Phone: (312) 641-9750
        Direct: (312) 641-9760
        Fax: (312) 641-9751

        Stephen M.  Tillery
        Douglas R. Sprong
        KOREIN TILLERY LLC
        505 North 7th Street,
        Suite 3600
        St.  Louis, MO 63101
        Phone:  (314) 241-4844
        Fax:  (314) 241-3525

        *Attorneys for Plaintiff*